1

2

3

UNITED STATES DISTRICT COURT

4

DISTRICT OF NEVADA

5

ALI BAHREMAN,

Case No. 2:20-cv-00437-ART-DJA

6

Plaintiff,

ORDER

v.

7

8

ALLEGIANT AIR, LLC, and
TRANSPORT WORKERS UNION OF
AMERICA LOCAL 577,

9

Defendants.

10

11

12

Before the Court are Motions for Summary Judgment by Plaintiff Ali
Bahreman ("Bahreman") (ECF No. 79), and Defendants Allegiant Air, LLC
("Allegiant") (ECF No. 76), and Transport Workers Union of America, Local 577
("TWU") (collectively, "Defendants") (ECF No. 77). The question before the Court
is whether Section 29 of the Collective Bargaining Agreement ("CBA") ("Section
29") between Allegiant and TWU is unlawful because it suspends bidding
privileges for union members and nonmembers if they fail to pay their union dues
or agency fees, respectively. For the reasons stated below, the Court denies
Bahreman's Motion for Summary Judgment (ECF No. 79) and grants Defendants'
Motions for Summary Judgment. (ECF Nos. 76, 77).

13

14

15

16

17

18

19

20

21

**I. BACKGROUND**

22

Bahreman was employed by Allegiant as a flight attendant between April 6,
2015, and June 10, 2022. (ECF No. 79 at 2). Allegiant is a common carrier by air
within the meaning of Section 201 of the Railway Labor Act. 45 U.S.C. § 152;
(ECF No. 77 at 3). TWU is the exclusive representative of the craft or class of flight
attendants employed by Allegiant. (*Id.*)

23

24

25

26

On December 21, 2017, Allegiant and TWU entered into a CBA. (*Id.*) Section
29 of the CBA is at issue in this litigation. Section 29 requires any flight attendant

27

28

to either apply for union membership within 60 days after the date of employment and pay union dues upon admittance to the TWU, or not join the union and pay a monthly "service charge"—commonly referred to as an "agency fee"—that contributes to TWU's representation of Allegiant's flight attendants but does not fund TWU's political activities. (*Id.* at 3-4). As discussed below, a flight attendant's bidding privileges are suspended under Section 29 if they pay neither union dues nor agency fees.

Bidding is the process by which Allegiant flight attendants are assigned work and vacation schedules. (ECF No. 76 at 5). Flight attendants "bid" on particular trips or days off to build their schedules for the upcoming month. (*Id.*) Allegiant processes attendants' bids in order of seniority, and flight attendants' work schedules are thereby awarded based on their seniority. (*Id.*)

Because bids are processed in the order of seniority, a flight attendant with lower seniority is less likely to be awarded the most desirable work schedules. For example, flight attendants with lower seniority are more likely to be assigned "reserve lines" that require 14-hour on-call periods on some days when no trip is assigned. (*Id.* at 5-6).

Under Section 29 D and E of the CBA, an Allegiant flight attendant's bidding privileges are suspended if they pay neither union dues nor agency fees. (ECF No. 77 at 4). This means that, although the attendant retains their seniority for other purposes, e.g., pay rates, their seniority is not taken into consideration in the bidding process. (ECF No. 76 at 7). The parties strongly disagree about the magnitude of the impact suspension of bidding privileges has on a given flight attendant's work schedule and pay, among other benefits. In plain terms, however, a flight attendant who pays either union dues or agency fees will have a higher likelihood of obtaining their preferred schedule than an attendant of equivalent seniority who pays neither their dues or fees and consequently has their bidding privileges suspended.

On September 3, 2019, Allegiant emailed Bahreman and informed him that his bidding privileges were suspended due to nonpayment of union dues or agency fees. (ECF No. 79 at 6). Bahreman's bidding privileges remained suspended due to nonpayment until he resigned his employment at Allegiant on June 10, 2022. (*Id.*)

Bahreman initiated this action on March 3, 2020. On March 21, 2021, District Judge Richard F. Boulware II denied Defendants' Motions to Dismiss without prejudice. (ECF No. 42).

On September 14, 2022, Defendants filed their Motions for Summary Judgment. (ECF Nos. 76, 77). On the same day, Bahreman filed his own Motion for Summary Judgment. (ECF No. 79).

On July 10, 2023, this Court held oral argument on the Parties' Motions to Dismiss. (ECF Nos. 76, 77, 79).

For the reasons discussed herein, the Court grants Defendants' Motions for Summary Judgment (ECF Nos. 76, 77) and denies Bahreman's Motion for Summary Judgment. (ECF No. 79).

**II. LEGAL STANDARD**

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at

issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *See Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986) (citation omitted).

The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient[.]" *Anderson*, 477 U.S. at 252.

## III.   DISCUSSION

### A. Section 2, Eleventh of the RLA

Bahreman asserts three claims: that Section 29 violates § 2, Eleventh (a) of the RLA because termination is the sole remedy under the RLA for nonpayment of union membership dues or service fees (Claim I); that service fees are "discriminatory" and coercive in violation of § 2, Fourth (Claim II); and that the Defendants have violated the RLA's duty of fair representation by conditioning

4

bidding privileges on payment of membership dues or agency fees (Claim III). Bahreman seeks summary judgment on all three claims, as does each Defendant. There are no disputed issues of fact relevant to these claims, which turn on whether an employee can lawfully have their bidding privileges suspended for nonpayment of union membership dues or service fees.

The parties agree that Section 29 is not a union security agreement within the statutory meaning of § 2, Eleventh (a) of the RLA, but disagree about whether it is lawful for employees to lose bidding privileges—rather than face termination—for failing to pay union dues or agency fees. (*See* ECF Nos. 76 at 3; 77 at 17; 92 at 19). Because such a contractual term is lawful, Defendants are entitled to summary judgment.

Congress enacted § 2, Eleventh of the RLA in 1951 to eliminate so-called "free riders." *Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps*, 466 U.S. 435, 447 (1984) ("We remain convinced that Congress' essential justification for authorizing the union shop was the desire to eliminate free riders . . . .") Free riders are employees who receive the benefits of union representation (e.g., a negotiated collective bargaining agreement) without paying anything towards the costs of collective bargaining and other related activities. *See Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 762 (1961) (explaining that the freeriding issue was "decisive with Congress" in enacting § 2, Eleventh). The Supreme Court in *Steele v. Louisville & N.R. Co.,* 323 U.S. 192, 202 (1944), required that unions represent the interests of both union and nonunion members fairly and equitably. After *Steele,* unions lobbied Congress for a mechanism to avoid freeriding by employees who would receive the benefits of union representation but not pay anything towards the expenses of that representation. Congress responded by enacting § 2, Eleventh (a), which authorizes a "union security agreement." Under § 2, Eleventh (a) carriers and labor organizations may "make agreements, requiring, as a condition of

continued employment, that within sixty days following the beginning of such employment . . . all employees shall become members of the labor organization representing their craft or class . . . ." 45 U.S.C. § 152, Eleventh (a).

As interpreted by the Supreme Court, a union security agreement gives employees a choice: they are not required to join the union but must pay their fair share for union representation by paying either union membership dues or an "agency fee" for nonmembers. Three aspects of this choice are important and well-settled. First, union membership is not required as the Supreme Court recognized in *Street,* 367 U.S. at 770, *Ellis*, 466 U.S. at 455-56, and other cases. Second, in lieu of membership dues unions may extract a lesser "agency fee" from nonmembers that pays for activities associated with collective bargaining and general representation but does not fund any political activities on the part of the union. *See Street,* 367 U.S. 740 at 770; *Ellis*, 466 U.S. at 447. In *Railway Emp. Dept. v. Hanson*, the Supreme Court found agency fees imposed under § 2, Eleventh (a) constitutional, holding that "the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work is within the power of Congress." *Railway Emp. Dept. v. Hanson*, 351 U.S. 225, 238 (1956). Third, a "union security agreement" requires payment of membership dues or agency fees "as a condition of continued employment," so it authorizes termination for nonpayment of either membership dues or agency fees. 45 U.S.C. § 152, Eleventh (a).

Bahreman argues that Section 29 is an "illegal union security agreement" because it provides for suspension of bidding privileges, not termination, for nonpayment of dues or fees. Bahreman insists that termination from employment is the sole remedy for combating freeriding. (ECF No. 79 at 21 ("The RLA is clear: termination from employment is the only permissible enforcement of a lawful 'union security' contract; loss or discrimination of any other CBA benefit is not permissible or legal.")) Section 29 is neither a "union security agreement" nor

unlawful. Neither the statutory text nor the case law mandates termination nor prohibits lesser penalties for nonpayment of dues or fees.

To fall within the statutory definition under § 2, Eleventh (a), a union security agreement requires termination as a remedy for nonpayment of dues or fees. *See* 45 U.S.C. § 152, Eleventh (a) (requiring union membership—construed to include payment of agency fees—within 60 days of employment "as a condition of continued employment.") Section 29 is not a "union security agreement" precisely because it does not impose termination as a penalty for nonpayment of dues or fees. *See, e.g.*, *Bhd. of Locomotive Engineers v. Kansas City S. Ry. Co.*, 26 F.3d 787, 790, 792-93 (8th Cir. 1994); *Corzine v. Bhd. of Locomotive Engineers*, 147 F.3d 651, 653-54 (7th Cir. 1998). That Congress authorized termination to combat free riders in no way indicates that Congress barred parties from negotiating lesser penalties. Bahreman's argument that termination is the only contractual penalty for nonpayment of dues or fees cannot be squared with the statutory text or the Supreme Court's jurisprudence around § 2, Eleventh (a).

First, the Supreme Court's jurisprudence around § 2, Eleventh (a) makes clear that it is not subject to a strict textualist reading that would literally require an employee to join the union or be terminated. The Supreme Court foreclosed such a reading of § 2, Eleventh (a) when it held in *Street*, *Ellis*, and other cases that employees need not join the union to satisfy the union security agreement—they may also not join the union and pay a reduced agency fee that does not subsidize the union's political activities. Bahreman argues that there is one authorized remedy for failing to pay union dues or agency fees: termination. (ECF No. 79 at 21). Bahreman's implied insertion of "only" into the statutory text (carriers "shall be permitted to [only] make agreements, requiring, as a condition of continued employment, that . . . all employees shall become members of the labor organization") directly conflicts with the Supreme Court's express allowance of agency fees in lieu of union membership to satisfy § 2, Eleventh (a).

1    Second, Bahreman fails to distinguish so-called "dual unionism" cases, where

2    courts from the First, Seventh, and Eighth Circuits have uniformly held that

3    seniority-based penalties for failure to pay dues or agency fees are lawful under

4    § 2, Eleventh (a) and (c). Dual unionism cases are directly analogous to the

5    present case because they involve contractual clauses that freeze or eliminate

6    seniority for employees if they do not pay an agency fee. This is precisely the type

7    of contractual arrangement Bahreman insists is unlawful because it includes a

8    seniority-based penalty for nonpayment, rather than termination.

9        Dual unionism cases arise where an employee begins work in a class

10   represented by one union (for sake of discussion, "Union A"), and then advances

11   into a different class represented by a different union, ("Union B"). Dual unionism

12   cases are most common in the railroad context, where "[A]spirant engineers

13   started as firemen, belonging to [Union A], and rose to be engineers, at which

14   point they might want to belong to [Union B]." *Corzine v. Bhd. of Locomotive*

15   *Engineers*, 147 F.3d 651, 653 (7th Cir. 1998). Employees in this situation are

16   reluctant to give up their membership and seniority in Union A, especially if they

17   may need to return to a Union A job in the future. To avoid the burden of being

18   a member of two unions at once, Congress passed § 2, Eleventh (c), which allows

19   employees to satisfy the requirements of § 2, Eleventh (a) through membership

20   in a national union. *See* 45 U.S.C. § 152 Eleventh (c). This "allows engineers who

21   belong to [Union A] by virtue of having started as firemen to work as engineers

22   without having to join [Union B] in order to retain seniority in both crafts . . . ."

23   *Corzine*, 147 F.3d at 653. § 2, Eleventh (c) therefore relieves these employees "of

24   the dual expenses of 'dual unionism.'" *Id.* (citations omitted). The combined effect

25   of § 2, Eleventh (a) and (c) is that a collective bargaining agreement cannot require

26   that the employee simultaneously enter into union security agreements with

27   more than one union. *Id.* at 654.

28       Two features of the dual unionism cases are germane here. They confirm, first,

8

that the CBA, specifically Section 29, is not a union security agreement and, second, that CBA's can impose non-termination penalties for nonpayment of fees or dues. In the dual unionism cases, the "dormant" union—Union A in the example above—inserted clauses into its CBA requiring employees either stay members of Union A *or* pay agency fees to Union A to retain their seniority. Courts have uniformly concluded that such clauses are lawful even though they are *not* union security agreements because Union A was not "conditioning [the employee's] *employment* in the engineers' craft on their belonging to [Union A], but only their *retention of seniority* in the train service—a very different thing." *Corzine*, 147 F.3d at 654 (emphasis in original); *see also Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 229-30, 231, 233 (1st Cir. 1996) (Conditioning seniority rights upon payment of dues or agency fees did not violate RLA. "Article 21 does not require an engineer to choose between dual union membership or unemployment; Article 21 simply requires an engineer to choose whether to retain and continue to accrue seniority in the train service craft."); *Bhd. of Locomotive Engineers v. Kansas City S. Ry. Co.*, 26 F.3d 787, 790, 792-93 (8th Cir. 1994) (Holding provision at issue was not a union security agreement and lawful under § 2, Eleventh.); *Dempsey v. Atchison, Topeka and Santa Fe Ry., Co.*, 16 F.3d 832, 834 (7th Cir. 1994) (same).

Although Bahreman argues that the dual unionism cases do not apply, he misapprehends their significance. Bahreman argues that he is being forced to choose between paying an agency fee or "surrender[ing] CBA seniority-based benefits to which [he] is already legally entitled," whereas the dual unionism cases "concerned non-bargaining unit railroad employees seeking CBA benefits to which they were not entitled from unions who did not represent them."[1] (ECF No.

---

[1] The Court notes that any seniority-based benefits are creatures of the CBA which created them, not a legal right to which an employee is independently entitled. *See, e.g., Wightman*, 100 F.3d at 232 ("[U]nion contracts typically define

92 at 10-11). As cited here, dual unionism cases stand for the proposition that a contractual agreement between a union and a carrier including seniority-related penalties for nonpayment is not a "union security agreement" within the statutory language of § 2, Eleventh (a) because the penalty for nonpayment is something other than termination. *See Corzine*, 147 F.3d at 654, 655 (holding an agreement including seniority-based penalties for nonpayment was not a union security agreement and lawful under § 2, Eleventh (a) and (c)); *see also Bhd. of Locomotive Engineers*, 26 F.3d at 792-93. To hold, as Bahreman urges, that § 2, Eleventh (a) *only* authorizes union security agreements and that § 2, Fourth bans *any* other kind of agreement (that is to say clauses with penalties for nonpayment other than termination) would require ignoring the dual unionism jurisprudence by the First, Seventh, and Eighth Circuits, which have uniformly found that employees may be lawfully required to pay agency fees to a union or lose their seniority with that union under § 2, Eleventh.

For the foregoing reasons, the Court concludes that Section 29 of the CBA is lawful under § 2, Eleventh of the RLA.

**B. Section 2, Fourth of the RLA**

Next, Bahreman argues that Section 29 violates § 2, Fourth's prohibition on carriers "influenc[ing] or coerc[ing] employees in an effort to join or remain or not to join or remain members of any labor organization . . . ." 45 U.S.C. § 152, Fourth.[2]

Bahreman argues that Section 29 violates § 2, Fourth because the suspension

---

the scope and significance of seniority rights . . . . Seniority, therefore, does not stem from the employer-employee relationship and by extension become and employment right, but rather from either a statute or the four corners of a collective bargaining agreement. . . .")

[2] § 2, Fourth primarily addresses the "precertification rights and freedoms of unorganized employees." *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants,* 489 U.S. 426, 440 (1989). Although this case arises in the post-certification context, the Court considers Bahreman's arguments here in the interests of completeness.

of Bahreman's bidding privileges "coerced him in his right not to join *or pay* the union." (ECF No. 79 at 19-20) (emphasis added). According to Bahreman, "[c]oercion to pay mandatory union service fees or charges is the same as influence or coercion to join." (*Id.* at 20). Bahreman provides no pertinent citations to support this argument. Although Bahreman cites *Ellis*, 466 U.S. at 455 and *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 303, 303 n.10 (1986), neither provides support. [3] *Ellis,* which concerned the use of nonmember agency fees, affirmed the legality of those fees, holding that "employees may be compelled to pay their fair share" of expenses associated with collective bargaining, grievances, and related expenses. *Ellis,* 466 U.S. at 448. *Hudson,* which concerned the union's procedures for processing agency fees from nonmembers to avoid subsidizing union political activity, is inapposite because Bahreman makes no claim that his agency fees would be used for an unauthorized purpose. *See Hudson*, 475 U.S. at 302-03.

At oral argument, Bahreman advanced a similar argument that "membership" is a "term of art" in the RLA that includes paying agency fees to a union. Therefore, according to Bahreman § 2, Fourth's prohibition on "influenc[ing] or coerc[ing] employees in an effort to join or remain or not to join or remain members of any labor organization" applies to influencing employees to *pay* their agency fees or union dues. 45 U.S.C. § 152, Fourth. This argument fails for two

---

[3] Bahreman additionally cites *Radio Officers' Union of Commercial Telegraphers v. NLRB*, 347 U.S. 17 (1954), which is inapposite because it arose under the NLRA, rather than the RLA, and involved claims that union members were treated differently than nonmembers. In *Radio Officers*, a union member was stripped of his seniority in route assignments for failing to timely pay union dues. *Id.* at 26-27. The plaintiff's seniority was affected because he was a union member; he would not have lost seniority as a nonmember. *See Teamsters Loc. 41 (Byers Transportation, Inc.),* 94 NLRB 1494, 1495 (1951). Here, union members and nonmembers, governed by the RLA, face the same seniority-based penalty for nonpayment. Another *Radio Officers* plaintiff alleged differential wage treatment for union and nonunion members. *See Radio Officers*, 347 U.S. at 46. Bahreman makes no such claim here.

reasons. First, reading § 2, Fourth in the way Bahreman suggests would require overturning the dual unionism jurisprudence of the First, Seventh, and Eighth Circuits because the seniority-based penalties in the dual unionism cases discussed above were held lawful under § 2, Fourth and Eleventh. *See, e.g.* *Locomotive Engineers*, 26 F.3d at 795; *Dempsey*, 16 F.3d at 843. Second, collapsing membership in a union with the payment of agency fees to a union undermines the entire rationale of cases like *Street* and *Ellis*, where the Supreme Court explicitly found compelling agency fees lawful under the RLA by *differentiating* union membership from the payment of agency fees. *See, e.g.*, *Ellis*, 466 U.S. at 447-48 ("Only a union that is certified as the exclusive bargaining agent is authorized to negotiate a contract requiring all employees to *become members of or make contributions to* the union." (emphasis added)).

Fundamentally, Section 29 does not coerce an employee to become a member of the TWU. Section 29 imposes precisely the same penalty on both union members and nonmembers when they fail to pay either their union dues or agency fees. Therefore, the Court finds that Section 29 is lawful under § 2, Fourth of the RLA.

### C. Duty of Fair Representation

Finally, Bahreman claims that TWU violated its duty of fair representation by "targeting Bahreman and other union-represented flight attendants" by denying them seniority-based privileges for "refusing to join and pay the union." (ECF No. 79 at 29). The RLA requires fair representation of and prohibits "hostile discrimination against" any person represented but the union, regardless of membership. *Steele*, 323 U.S. at 202-03. "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967).

Here, TWU's enforcement of Section 29 is not arbitrary, discriminatory, or in

bad faith because Section 29 treats all nonpayers alike regardless of their membership in the union. Section 29.D states that if a flight attendant fails to pay either their "membership dues or service charge" they will be "subject to loss of all bidding privileges." (ECF No. 31-1 § 29). Congress and the Supreme Court have plainly authorized the extraction of agency fees from nonmembers to pay their share of collective bargaining costs. Section 29 is merely a mechanism to encourage payments from union members and nonmembers alike. As Bahreman has made no claim that TWU personally discriminated against him on the basis of his status as a nonmember (as opposed to his status as a *nonpayer*), Bahreman's duty of fair representation claim accordingly fails.

Finally, Bahreman's citation to *Addington v. U.S. Pilots Ass'n*, 791 F.3d 967 (9th Cir. 2015) is unhelpful. (*See* ECF No. 92 at 13 n.67, 23 n.120, 123). *Addington* did not involve union security agreements or either § 2, Fourth or Eleventh.[4] Instead, *Addington* concerned a "raw exercise of political power" by one group of pilots over another during a merger where one group of pilots were treated "as though they were nonunion members." *Addington*, 791 F.3d at 985. In *Addington,* the union "clearly favor[ed] one side in the intra-union dispute." *Id.* at 988. Unlike in *Addington,* here union members and nonmembers are subject to the same penalty for not paying dues or agency fees.

For the foregoing reasons, the Court holds that Section 29 does not violate TWU's duty of fair representation.

## IV. CONCLUSION

Under the RLA as interpreted by the Supreme Court, unions like TWU have a statutory duty to represent nonmembers and members equally. Therefore, TWU may require payment of member dues or agency fees as a condition of

---

[4] This is also true of another case Bahreman repeatedly cites as binding Ninth Circuit precedent, *Bernard v. Air Line Pilots Ass'n, Int'l*, 873 F.2d 213 (9th Cir. 1989).

1   employment and may uniformly impose seniority-related penalties for
2   nonpayment of member dues or agency fees.

3        The Court notes that the parties made several arguments and cited to
4   several cases not discussed above. The Court has reviewed these arguments and
5   cases and determines that they do not warrant discussion as they do not affect
6   the outcome of the motions before the Court.

7        Therefore, it is ordered that Bahreman's Motion for Summary Judgment
8   (ECF No. 79) is denied.

9        It is further ordered that TWU's Motion for Summary Judgment (ECF No.
10  77) is granted.

11       It is further ordered that Allegiant's Motion for Summary Judgment (ECF
12  No. 76) is granted.

13

14

15       DATED THIS 9th day of August 2023.

16

17

18  _____
19  ANNE R. TRAUM
    UNITED STATES DISTRICT JUDGE
20

21

22

23

24

25

26

27

28